UNITED STATES of America,
Plaintiff–Appellee,

v.

Jerome W. BULLIS, Defendant–
Appellant.

No. 94–3859.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 21, 1995.

Decided Feb. 28, 1996.

John J. Powers, III, Department of Justice, Antitrust Division, Appellate Section, Washington, DC, Marvin Price, Steven E. Uhr, United States Department of Justice, Chicago, IL, Michael G. Pateyuk, United States Department of Justice, Antitrust Division, Chicago, IL, Mark S. Popofsky (argued), Department of Justice, Washington, DC, for Plaintiff–Appellee.

Jeffrey E. Stone (argued), Scott Martin, McDermott, Will & Emery, Chicago, IL, for Defendant–Appellant.

Before CUMMINGS, MANION, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

The defendant was convicted of one count of conspiring to rig bids, allocate customers, and fix prices on dairy products sold to schools and school districts in northern Indiana and southern Michigan in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. He appeals his conviction on the grounds that the superseding indictment was the result of prosecutorial vindictiveness and that there was an impermissible variance between the single conspiracy charged in the superseding indictment and the proof at trial. He appeals his sentence on the ground that it is in violation of the Ex Post Facto Clause. We affirm both the conviction and the sentence.

I

In order to ensure they received competitive prices on dairy supply contracts, the school districts involved in this case solicited sealed bids. The bidding season among the various school districts ran from May until August, and school districts awarded contracts for the whole school year. School districts generally awarded contracts to the lowest bidder. They made payments on the contracts throughout the school year.

At the beginning of the bidding season for the 1985–86 school year, the defendant, Jerome Bullis, who was the general manager of Allen Dairy located in Fort Wayne, Indiana, contacted Richard Bylsma, who was the treasurer and controller of the New Paris Creamery located in Elkhart, Indiana. Bullis requested that Bylsma meet with him so that they could discuss their bids for the coming school year. Bylsma agreed, and they, as well as Thomas Schenkel, who was in charge of sales at Schenkel's All Star Dairy located in Huntington, Indiana, and at Pure Sealed Dairy located in Fort Wayne (collectively "Schenkel's dairies"), met at the Jade Buddha Restaurant in Kendalville, Indiana. At the meeting, the three agreed that their respective dairies would not competitively bid against each other. The conspirators carried out the scheme by allocating various school districts among the dairies. The three agreed on the maximum amount a dairy could bid on one of its allocated school districts and agreed that, with respect to that district, the other two dairies would either bid above that amount or not submit a bid. With the exception of one school district allocated to Schenkel's dairies and successfully bid on by New Paris, the dairies won the contracts for the districts they had been allocated.

Bullis contacted Bylsma again in May 1986, prior to the 1986–87 bidding season, to set up another meeting. They again decided to meet at the Jade Buddha Restaurant. However, instead of Bullis, Gerald Widenhofer, the sales manager, represented Allen Dairy. The conspirators agreed that each dairy would be allocated the same school districts for the 1986–87 school year as for the 1985–86 school year. The conspirators also agreed on updated prices.

Bullis telephoned Bylsma again in May 1987, prior to the 1987–88 bidding season, to

set up another meeting. However, because of investigations into the dairy industry that were being conducted elsewhere in the country, they decided not to meet. Bullis told Bylsma that the conspirators' dairies would all receive the same school districts as in the previous years. Bullis sent Bylsma an updated price list, which the participating dairies used to bid on contracts for the 1987–88 school year.

The allocations had been disrupted in 1986 when Scholl Dairy, located in Michigan City, Indiana, successfully bid on two school districts within the ambit of the conspiracy. During the 1987–88 bidding season, Andrian Lehman, the branch manager of the local distribution facility of Schenkel's All Star Dairy, at the direction of Tom Schenkel, contacted Stephen Scholl, president of Scholl Dairy, and proposed an allocation of four school districts. Scholl initially declined, but eventually agreed after Lehman made the same offer before the start of the 1988–89 bidding season.

Prior to the 1988–89 bidding season, Scholl also agreed with Widenhofer to allocate certain school districts between Scholl Dairy and Allen Dairy. At this time, Bullis was still the general manager of Allen Dairy and responsible for submitting the school bids. Again, the conspirators carried out the anti-competitive bidding scheme through setting the maximum bidding price for the winning dairy, which would also act as the minimum bidding price for the nonwinning dairies.

Prior to the 1989–90 and 1990–91 bidding seasons, Scholl and Schenkel agreed to allocations of schools and relevant bidding prices. Scholl and Widenhofer also agreed to allocations and prices for the 1989–90 and 1990–91 bidding seasons. And although Scholl and Schenkel did not specifically renew their allocations during the 1991–92 bidding season, their dairies won the various school district contracts consistent with the allocations of the previous years. Scholl and Widenhofer did talk during the 1991–92 bidding season and agreed to maintain the same allocations as the previous year, with some modifications to pricing. Payments made on allocated contracts continued into 1992.

Bullis left the Indiana dairy industry in July 1989 when he took a job with SECO Dairies located in Florida. SECO was a buying group that purchased large quantities of dairy items, repackaged them, and then sold them in smaller quantities to dairies. SECO was not involved in bidding on school milk contracts. Although Bylsma retained a position at New Paris, prior to the 1990–91 bidding season he relinquished responsibility for bidding on school milk contracts. This change occurred as a result of an internal investigation into price fixing by the attorneys for New Paris' parent corporation, Finevest. After being questioned about potential price fixing, Bylsma informed the Finevest attorneys of the bid-rigging conspiracy. They all agreed that he should no longer bid on school dairy contracts. Finevest's attorneys then contacted the government in June 1991. Although Bylsma's story was relayed to the government by way of Finevest, he did not have direct contact with the government until December 3, 1991.

■ After Bullis left Allen Dairy in 1989, he made two relevant phone calls to Bylsma. In the first, which occurred during 1990, Bullis told Bylsma that he did not think that the price fixing investigation would reach Indiana and that Bylsma should not worry about it. In the second, which occurred in early November 1991,[1] Bullis said that "the

---

1. The district court fixed the date of this conversation as November 2, 1991. Bullis disputes this date and points to the fact that a penalty-enhancing amendment to the guidelines took effect on November 1, 1991. See U.S.S.G. app. C, amend. 377 (1995). However, not only is there ample support for the district court's factual determination that the call took place on November 2, 1991, but setting that date as the date of the phone conversation does not have the legal significance Bullis assigns to it. Either Bullis withdrew from the conspiracy in July 1989, which is prior to the November 1, 1991, amendment, or he did not. Consequently, if the second conversation is evidence that he did not withdraw, that conversation could have occurred in September or October and have the same effect of extending Bullis' sentencing liability past the November 1, 1991, effective date of the amendment. This is because unless a conspirator withdraws from a conspiracy, he is liable for the reasonably foreseeable acts of his coconspirators until the con-

investigation into price fixing in Indiana was deep and it could get real shitty" and that "all he was going to tell them was that he was talking about pooling milk."

On December 16, 1992, the defendant, Jerome Bullis, was indicted along with Thomas Schenkel, Gerald Widenhofer, Schenkel's All Star Dairy, and Six S Corporation (d/b/a Pure Sealed Dairy). The one-count indictment alleged a violation of the Sherman Act involving a conspiracy to fix dairy prices on school dairy contracts in eleven counties in northern Indiana and southern Michigan lasting from 1985 to 1988. A superseding indictment was entered on March 19, 1993, and it added six Indiana counties to those already described in the original indictment and extended the charged duration of the conspiracy until 1992. Following a two-week trial in which Bylsma and Scholl testified under grants of immunity, the jury convicted Bullis and acquitted the other defendants. The district court found, as the probation officer had recommended in the presentence report, that Bullis remained a member of the conspiracy until it terminated in 1992. As a result, the district court applied the 1993 Sentencing Guidelines, and on November 30, 1994, the district court sentenced Bullis to thirty months of incarceration and one year of supervised release. The district court also imposed a $50 special assessment and a $5,000 fine. On December 13, 1994, the district court granted Bullis' motion for bond pending appeal. Bullis filed a timely notice of appeal on December 8, 1994, and we have jurisdiction over his appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## II

### A

■ In the first challenge to his conviction, Bullis argues that the superseding indictment was the result of prosecutorial vindictiveness and that the district court erred in denying his motion to dismiss the superseding indictment on that ground. We will review the district court's legal conclusions *de novo*, but we will not upset the district court's factual findings unless they were clearly erroneous. *United States v. Gilbert*, 45 F.3d 1163, 1168 (7th Cir.1995).

The superseding indictment set forth the same, single count as the original indictment: a violation of 15 U.S.C. § 1. In fact, the superseding indictment is identical to the original indictment, except that it expanded the duration of the charged conspiracy to include the school years 1988–89 through 1991–92, and it expanded the geographic scope of the charged conspiracy to include school districts in an additional six counties. On March 2, 1993, the government notified the court and the defendants that it intended to seek a superseding indictment. That notification came shortly after the district court on February 3 granted the defendants' motion to transfer the case from the Hammond Division to the Fort Wayne Division of the Northern District of Indiana. Bullis alleges that the government brought the superseding indictment in retaliation for the defendants' requested transfer because the transfer of the case to the Fort Wayne Division seriously inconvenienced the government. Bullis alleges that the government intended to punish him by extending the duration of the conspiracy so that he would be sentenced under the 1991 Sentencing Guidelines, which would provide a harsher sentence than the 1989 guidelines.[2]

■ "A prosecution is vindictive and a violation of due process if undertaken '[t]o punish a person because he has done what the law plainly allows him to do.'" *United States v. Polland*, 994 F.2d 1262, 1266 (7th Cir.1993) (quoting *United States v. Goodwin*, 457 U.S. 368, 372, 102 S.Ct. 2485, 2488, 73

---

spiracy terminates. *United States v. DePriest*, 6 F.3d 1201, 1212 (7th Cir.1993).

**2.** Bullis was sentenced under the 1993 sentencing guidelines, which did not provide for a different sentence than the 1991 guidelines. *See* U.S.S.G. § 1B1.11 (sentencing court shall use guidelines in effect at time of sentencing unless they provide a higher level of punishment than

those in effect at the time the crime was committed). Pursuant to Amendment 377, effective November 1, 1991, the base offense level under § 2R1.1 was raised one point, and the upward adjustments for the various levels of commerce were raised. *See* U.S.S.G. app. C, amend. 377 (1995).

L.Ed.2d 74 (1982)), *cert. denied,* —— U.S. ——, 114 S.Ct. 1115, 127 L.Ed.2d 425 (1994); *see also United States v. Porter,* 23 F.3d 1274, 1278 (7th Cir.1994); *United States v. Cyprian,* 23 F.3d 1189, 1196 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 211, 130 L.Ed.2d 139 (1994). We presume that a prosecutor's decision to seek increased charges in a superseding indictment is valid. *Goodwin,* 457 U.S. at 384, 102 S.Ct. at 2494. Therefore, in order to be successful on a claim of prosecutorial vindictiveness, a defendant must affirmatively show through objective evidence that the prosecutorial conduct at issue was motivated by some form of prosecutorial animus, such as a personal stake in the outcome of the case or an attempt to seek self-vindication. *Id.* In certain, limited circumstances, a defendant is entitled to a presumption of prosecutorial vindictiveness. *Blackledge v. Perry,* 417 U.S. 21, 28, 94 S.Ct. 2098, 2102, 40 L.Ed.2d 628 (1974) (presumption arises where circumstances surrounding bringing of enhanced charges give rise to a "realistic likelihood of 'vindictiveness'"). However, a presumption of vindictiveness does not arise where, prior to trial, the prosecutor brings enhanced charges following the defendant's exercise of a procedural right. *Goodwin,* 457 U.S. at 381–82, 102 S.Ct. at 2492–93; *see also United States v. Nichols,* 937 F.2d 1257, 1261 (7th Cir.1991), *cert. denied,* 502 U.S. 1080, 112 S.Ct. 989, 117 L.Ed.2d 151 (1992). Where either the presumption of vindictiveness applies or the defendant has come forward with objective evidence of actual vindictiveness, the burden shifts to the government to come forward with evidence that the motivation behind the charges was proper.

 Because the government brought the superseding indictment pretrial, following the transfer, Bullis is not entitled to the presumption of vindictiveness; he must come forward with objective evidence of actual vindictiveness. Bullis' only evidence of actual vindictiveness is that the Justice Department's Antitrust Division office that prosecuted the case is located in Chicago—much closer to the federal court in Hammond than the federal court in Fort Wayne—and therefore that the transfer of the case to the Fort Wayne Division must have seriously inconve-

nienced the prosecution. However, Bullis' claim of inconvenience is undermined by the fact that the transfer to the Fort Wayne Division was actually more convenient for presentation of the government's case; as Bullis notes, most of the government's witnesses lived closer to the Fort Wayne Division than the Hammond Division. Additionally, the fact that a defendant exercises a procedural right and, as a result, imposes a modest burden upon a prosecutor is not sufficient to show actual vindictiveness. *See Goodwin,* 457 U.S. at 383, 102 S.Ct. at 2493–94 (burden imposed by jury trial request insufficient to even show realistic likelihood of vindictiveness). The defendant must come forward with evidence of prosecutorial animus, not mild inconvenience.

 The district court found that even if Bullis had been entitled to the presumption of vindictiveness, the government presented sufficient evidence that the superseding indictment was motivated by permissible factors. That finding was not clearly erroneous. Prior to the cooperation of Stephen Scholl, the government did not have any evidence that the conspiracy extended beyond the 1987–88 school year. After Scholl began cooperating, the government learned that the conspiracy actually continued until 1992. They also learned from Scholl that the conspiracy involved school districts in two additional counties. The record discloses that Scholl did not begin cooperating with the government until February 1, 1993, two days prior to the district court's grant of the defendants' motion to transfer and slightly over a month prior to the government's notification that it would seek a superseding indictment. Therefore, there is no evidence to suggest that the relatively quick entry of the superseding indictment following the successful motion to transfer was anything more than a temporal coincidence. As for the expansion of the charged conspiracy's geographic scope through the addition of school districts in four counties not provided by Scholl, there is no evidence that sheds doubt on the district court's perception that the expansion was merely the result of the prosecution's permissible reassessment of the conspiracy in light of Scholl's information. *See*

*Goodwin,* 457 U.S. at 381, 102 S.Ct. at 2492 ("In the course of preparing a case for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution or he simply may come to realize that information possessed by the State has broader significance.").

### B

▮ Bullis next challenges his conviction on the ground that there was an impermissible variance between the single conspiracy charged in the superseding indictment and the proof at trial, which he claims demonstrated multiple conspiracies. He argues that the evidence was only sufficient to implicate him in a distinct conspiracy that lasted from 1985 to 1988. We treat a defendant's challenge that the evidence showed multiple conspiracies rather than a single conspiracy as a challenge to the sufficiency of the evidence. *United States v. Curtis,* 37 F.3d 301, 305 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1110, 130 L.Ed.2d 1075 (1995); *United States v. Townsend,* 924 F.2d 1385, 1389 (7th Cir.1991).

▮ The jury gets the "first crack" at deciding the question of whether there existed a single or multiple conspiracies. *Curtis,* 37 F.3d at 305. We will uphold a jury's factual determination if, viewing the evidence in the light most favorable to the government, *any* rational juror could have found beyond a reasonable doubt that there was a single conspiracy. *United States v. Stephenson,* 53 F.3d 836, 846 (7th Cir.1995); *Curtis,* 37 F.3d at 305. Circumstantial evidence is sufficient to demonstrate the existence of a conspiracy; thus, it is enough if the government produced sufficient evidence from which the jury could reasonably *infer* that there was a single conspiracy. *Townsend,* 924 F.2d at 1390.

▮ The nature and scope of the conspiratorial agreement is "the determinative factor in distinguishing between single and multiple conspiracies." *United States v. Shorter,* 54 F.3d 1248, 1254 (7th Cir.) (quoting *United States v. Sababu,* 891 F.2d 1308, 1322 (7th Cir.1989)), *cert. denied,* —— U.S., ——, 116 S.Ct. 250, 133 L.Ed.2d 176 (1995).

If the alleged coconspirators joined together to further a single design or purpose, then there is a single conspiracy. *Shorter,* 54 F.3d at 1254. However, "if there are distinct illegal ends and no overlapping interests" between the alleged coconspirators, then there are separate conspiracies. *Id.*

Bullis argues that the evidence does not support an inference of a single conspiracy from 1985 to 1992. Instead, he argues that the evidence shows one conspiratorial agreement to rig bids between Bullis, Bylsma, and Schenkel, which lasted from 1985 to 1988, and separate conspiratorial agreements to rig bids, one between Scholl, Lehman, and Schenkel, and the other between Scholl and Widenhofer, both of which lasted from 1988 to 1992.

▮ Looking at the evidence in the light most favorable to the government, a reasonable jury could infer from the evidence at trial that what Bullis claims are separate conspiracies was in fact a single conspiracy with a common criminal objective: to rig bids so as to allocate certain school dairy contracts among Allen Dairy, Schenkel's dairies, New Paris Creamery, and Scholl Dairy from 1985 to 1992. The fact that the conspirators generally changed the pricing levels each year does not make each year a discrete conspiracy. "[W]hen the plot contemplates bringing to pass a continuous result that will not continue without the continuous co-operation of the conspirators to keep it up, and there is such continuous co-operation, it is a perversion of natural thought and of natural language to call such continuous co-operation a cinematographic series of distinct conspiracies, rather than to call it a single one." *United States v. Kissel,* 218 U.S. 601, 607, 31 S.Ct. 124, 126, 54 L.Ed. 1168 (1910). Additionally, even though some of the participants of the conspiracy changed from 1986 to 1992 with the addition of Widenhofer, Lehman, and Scholl, the departure of Bullis, and the receding role of Bylsma, turnover in the members of a conspiracy does not transform a single conspiracy into multiple conspiracies so long as there is a continuation of the original conspiracy's purpose. *United States v. Powell,* 982 F.2d 1422, 1431 (10th Cir. 1992), *cert. denied,* 507 U.S. 946, 113 S.Ct.

1356, 122 L.Ed.2d 736 (1993). Here, there was a continuation of the original conspiracy's purpose and design; in fact, both Allen Dairy and Schenkel's dairies allocated bids from the beginning of the conspiracy in 1985 to its end in 1992.

## III

In his sole challenge to his sentence, Bullis argues that calculating his sentence under the 1993 Sentencing Guidelines violated the Ex Post Facto Clause, U.S. CONST. art. I, § 9, cl. 3. The district court applied the 1993 guidelines after finding that Bullis remained a member of the conspiracy until it terminated in 1992.[3] Bullis challenges that finding, arguing that his criminal culpability ended prior to 1990. He correctly points out that, by virtue of amendment 377 to U.S.S.G. § 2R1.1, effective November 1, 1991, the 1993 guidelines provided for a higher level of punishment for his offense than the 1989 guidelines. See U.S.S.G. app. C, amend. 377 (1995). We have held that an ex post facto violation occurs where the defendant is sentenced under guidelines that were amended to his detriment after his commission of the crime. United States v. Seacott, 15 F.3d 1380, 1386 (7th Cir.1994). Therefore, if Bullis could successfully establish that his criminal culpability ended prior to November 1, 1991, then he would have a meritorious ex post facto claim.

## A

Bullis initially argues that he withdrew from the conspiracy in July 1989 when he left his job at Allen Dairy, took an unrelated job with a Florida dairy, and moved to Florida. The government responds that Bullis did not raise this objection prior to sentencing and that he affirmatively waived it in his supplemental sentencing memorandum. Bullis counters that the withdrawal objection was specifically raised on the day of sentencing.

Hearings on two separate and statutorily distinct matters took place on November 30, 1994. The first was the final sentencing hearing held pursuant to 18 U.S.C. § 3553, et seq. and FED.R.CRIM.P. 32. The second was the hearing on bond pending appeal authorized under 18 U.S.C. § 3143(b). As is typically the case, the district court did not call a recess at the conclusion of the sentencing proceeding and before hearing argument on the motion for bond pending appeal. There was, however, a pronounced break between these two temporally adjacent but procedurally independent matters. At the end of the sentencing hearing, the district court formally sentenced Bullis and authorized him to voluntarily surrender to the designated institution. The district court then queried, "Anything further, then, with respect to sentence?" Counsel for Bullis answered, "No, Judge." At no time prior to or during the sentencing hearing did Bullis object to application of the 1993 guidelines on the ground that he had withdrawn from the conspiracy in 1989.

▮▮▮ Withdrawal from the conspiracy was advanced for the first time during oral argument in the hearing on bond pending appeal.[4] The discussion of withdrawal at that point concerned whether the district court's application of the 1993, rather than the 1989, guidelines raised a substantial question of law. However, raising the issue of withdrawal during the postsentencing hearing on bond pending appeal is not sufficient to constitute a withdrawal objection to the district court's finding that the 1993 guidelines applied because Bullis had remained in the conspiracy until it ended in 1992. We require that all objections to a district court's findings with respect to the sentencing guidelines be made prior to or

---

**3.** In the presentence report issued March 15, 1994, and the addendum issued May 31, 1994, the probation officer recommended application of the 1993 guidelines on the ground that Bullis remained a member of the conspiracy after November 1, 1991. In the sentencing memorandum issued August 9, 1994, the district court found that a preponderance of the evidence supported a finding that Bullis remained a member of the conspiracy until 1992. During the final

sentencing hearing on November 30, 1994, the district court adopted the probation officer's factual recommendations and incorporated by reference its own sentencing memorandum.

**4.** The issue of withdrawal was not mentioned in Bullis' motion in support of bond pending appeal.

during the sentencing hearing. *United States v. Zarnes*, 33 F.3d 1454, 1474 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2286, 132 L.Ed.2d 288 (1995); *United States v. Price*, 988 F.2d 712, 722 (7th Cir. 1993).

It would be plausible to interpret one of Bullis' arguments in his presentencing memorandum as raising a withdrawal objection. In that memorandum, Bullis had objected to application of the 1993 guidelines on the ground that the conspiracy he was a member of terminated in 1988. Within the argument in support of that objection he stated: "Additionally, Bullis ceased his employment with Allen Dairy on July 31, 1989, and moved to the State of Florida. He obviously neither could foresee, control or have any involvement in any activity involving Allen Dairy beyond that date, particularly, if he was not talking with Bylsma." Standing alone, this statement could reasonably be interpreted as raising an objection on the grounds of withdrawal. However, Bullis' response to the government's rebuttal brief indicates that he did not intend to make a withdrawal objection. In its rebuttal to Bullis' objections to the presentence report, the government had argued that the conspiracy did not end in 1988 and that Bullis had not done enough to withdraw. Bullis responded:

> "The issue is not one of withdrawal as the government asserts. The issue is that the agreement to which Bullis joined concluded with the 1987/1988 school year."

 This response, read in the context of the government's argument that Bullis had not withdrawn, constitutes an "intentional relinquishment" of Bullis' known right to an objection based upon withdrawal. *See United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993). He therefore waived the objection, and waiver necessarily precludes salvage by plain error review. *Id.*

Nevertheless, the discussion between the court and counsel during the hearing on bond pending appeal discloses that the issue of Bullis' withdrawal from the conspiracy was a factor considered by the court in imposing sentence. In fact, the court authorized Bullis' release on bond pending appeal based, in part, on its determination that its sentencing finding that Bullis had not withdrawn from the conspiracy presented a substantial question of law under 18 U.S.C. § 3143(b)(1)(B)(iv). This circumstance, coupled with the technical nature of Bullis' failure to advance his withdrawal objection in a timely fashion and thereby retract his earlier waiver, prompts us to examine why the waiver of that objection was of no practical consequence.

 Even if we found that Bullis had preserved the withdrawal objection for appeal, the government presented sufficient evidence to support the district court's finding that Bullis continued in the conspiracy after leaving Allen Dairy. In order to withdraw from a conspiracy, a defendant must cease his activity in the conspiracy and take an affirmative act to defeat or disavow the conspiracy's purpose, either by making a full confession to the authorities or by communicating his withdrawal in a manner reasonably calculated to inform his coconspirators. *United States v. Sax*, 39 F.3d 1380, 1386 (7th Cir.1994); *Zarnes*, 33 F.3d at 1468. His withdrawal must be both complete and in good faith. *United States v. Andrus*, 775 F.2d 825, 850 (7th Cir.1985). The defendant bears the initial burden of production on the issue of withdrawal. *Price*, 988 F.2d at 723; *United States v. Schweihs*, 971 F.2d 1302, 1322–23 (7th Cir.1992). At sentencing, once the defendant advances sufficient evidence to show withdrawal, the prosecution must bring forth sufficient evidence to prove by a preponderance of the evidence that the defendant did not in fact withdraw. *United States v. Agrell*, 965 F.2d 222, 227 (7th Cir.1992).

 Assuming that Bullis set forth a prima facie case of withdrawal by leaving Allen Diary and moving to Florida, the government met its burden of showing that Bullis had not withdrawn. Conduct by a defendant after a purported withdrawal is relevant to whether the withdrawal was actually complete and in good faith. *See Sax*, 39 F.3d at 1387; *see also United States v. Antar*, 53 F.3d 568, 583 (3d Cir.1995) (defendant who resigns from conspiratorial enterprise but continues to do acts in furtherance of con-

spiracy or receive benefits therefrom has not withdrawn). In *Hyde v. United States*, the Supreme Court approved of an instruction directing a jury to look at the defendant's post-withdrawal conduct for purposes of determining if the former conspirator was still acquiescent in the goals of the conspiracy. 225 U.S. 347, 371–72, 32 S.Ct. 793, 803–04, 56 L.Ed. 1114 (1912). If that conduct evidences that the defendant continued to acquiesce in the goals of the conspiracy, then it would neutralize his otherwise valid withdrawal. *Id.* at 371, 32 S.Ct. at 804.

■ The government argued that the 1990 and 1991 phone calls from Bullis to Bylsma showed that Bullis had not withdrawn from the conspiracy. The district court agreed and so found. Because the question of whether the phone calls evidenced acquiescence in the goals of the conspiracy is one of fact, we will not reverse the district court's ruling unless it was clearly erroneous. *Bafia*, 949 F.2d at 1481.

Bylsma testified that during the 1991 conversation he expressed concern that the authorities might conduct a price fixing investigation in Indiana. Bullis responded that "he didn't think it would ever reach Indiana and not to worry about it." Bylsma further testified that during the November 1991 conversation Bullis told him that "the investigation into price fixing in Indiana was deep and it could get real shitty" and that "all he was going to tell them was that he was talking about pooling milk." Bylsma then "shut off" further discussion of the investigation and ended the conversation.

Bullis argues that the 1990 conversation was harmless and the 1991 conversation, at most, evidenced an intent to deny involvement in the conspiracy. Bullis challenges the application of *Hyde* to this case on the grounds that it is inconsistent with the Supreme Court's decision in *United States v. United States Gypsum Co.*, which allows a conspirator to withdraw from a conspiracy without cooperating with the authorities.

438 U.S. 422, 464–65, 98 S.Ct. 2864, 2887, 57 L.Ed.2d 854 (1978). Nullifying his otherwise effective withdrawal because he told another conspirator that he would lie if asked about the conspiracy, Bullis argues, is contrary to the implication of *Gypsum* that a conspirator may withdraw without having to incriminate himself. Even if we found merit in Bullis' argument, it is inapplicable in this case. Bullis went beyond merely stating that he would lie if asked about his conspiratorial activity.

■ The district judge could have reasonably inferred that during the 1991 conversation Bullis was attempting to induce Bylsma to lie if questioned regarding the conspiracy and, instead of just denying involvement, to provide the authorities with the innocuous explanation Bullis planned to use. The inference of an attempt to cover up the conspiracy is sufficient to support the conclusion that following his move to Florida Bullis still acquiesced in the goals of the conspiracy and, therefore, that he had not withdrawn. We do not read *Gypsum* to imply that an attempt to cover up an ongoing conspiracy is not an act in furtherance of that conspiracy.

Because the conspiracy had not terminated at the time of the 1991 phone call, finding that Bullis did not withdraw as a result of that call does not, as Bullis argues, conflict with *Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957). The question in *Grunewald* was what acts of concealment taken *after* a conspiracy has terminated extend the duration of the otherwise completed conspiracy. *Id.* at 401–05, 77 S.Ct. at 972–74. The government offered sufficient evidence that the conspiracy in this case continued until 1992. Therefore, even if Bylsma had withdrawn from the conspiracy by virtue of his cooperation with the government prior to the November 1991 call, Bullis' attempt to induce Bylsma to lie was still in furtherance of an ongoing conspiracy.[5] *See Soto v. United States*, 37 F.3d 252, 256 (7th Cir.1994) (conversations with investigators

---

5. The government argues that a defendant's act need not rise to the level of an act in furtherance of the conspiracy in order to qualify as evidence that the defendant "acquiesced" in the goals of the conspiracy for purposes of *Hyde*. However,

we need not reach that issue because we find that Bullis' 1991 call to Bylsma was, as an act to cover up or conceal an ongoing conspiracy, an act in furtherance of the conspiracy.

may be acts in furtherance of an ongoing conspiracy).

### B

 Bullis next argues that the district court erred in finding that he could have reasonably foreseen the continuation of the conspiracy into 1992. He argues that he could only have foreseen the conspiracy continuing until the 1987–88 school year, which was the last year he entered an agreement to allocate schools and rig bids. A conspirator is only liable for the conspiratorial acts of his coconspirators if they were reasonably foreseeable to him. *See Pinkerton v. United States,* 328 U.S. 640, 647–48, 66 S.Ct. 1180, 1184–85, 90 L.Ed. 1489 (1946); *United States v. Young,* 997 F.2d 1204, 1209–10 (7th Cir. 1993). The district court's determination of foreseeability is a factual determination reviewable only for clear error. *United States v. Edwards,* 36 F.3d 639, 647 (7th Cir.1994). We find no error.

 The evidence produced during trial and at sentencing shows that Bullis brought Widenhofer, his subordinate at Allen Dairy, into the conspiracy when he sent Widenhofer in his place for the 1986 meeting. Therefore, it was reasonably foreseeable to Bullis that Widenhofer would continue the conspiratorial allocation scheme on behalf of Allen Dairy following Bullis' departure for Florida. Furthermore, the government produced evidence that Bullis had unsuccessfully sought to expand the scope of the conspiracy eastward by contacting a sales manager of an Ohio dairy during 1988. It was therefore reasonably foreseeable to Bullis that Schenkel would also seek to expand the scope of the conspiracy, which he did by recruiting Scholl. The conspiratorial allocations Bullis set in motion in May 1985 between Allen, New Paris, and Schenkel's dairies continued virtually unchanged during his tenure at Allen Dairy. As a result, it would be patently unreasonable for us to conclude that Bullis could not foresee the continuance of those allocations for two more years after he left.

### C

 Bullis' final argument for the proposition that he should have been sentenced under the 1989 guidelines is that the conspiracy of which he was a member ended with the 1987–88 school year. However, for the same reasons we rejected this argument above as an "impermissible variance" challenge to his conviction, we reject it as an objection to his sentence. The conspiratorial agreement at issue certainly contemplated a single conspiracy extending beyond the 1987–88 school year. The district court's finding that the conspiracy for which Bullis is responsible did not end in 1987–88 is, therefore, not clearly erroneous.

For the foregoing reasons, the defendant's conviction and sentence are AFFIRMED.