In the

# United States Court of Appeals

## For the Seventh Circuit

―――――――

No. 05-4222

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TERRY THOMAS,

*Defendant-Appellant.*

―――――――

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 902—**Rebecca R. Pallmeyer**, *Judge.*

―――――――

ARGUED MARCH 28, 2007—DECIDED MARCH 24, 2008

―――――――

Before POSNER, ROVNER, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* A jury convicted Terry Thomas of possessing and conspiring to possess heroin and crack cocaine with intent to distribute. Thomas asks us to reverse his convictions on the grounds that (1) the trial evidence established multiple conspiracies at variance with the single charged conspiracy; (2) the federal prosecution was vindictive because the grand jury returned the indictment against him while he was under state charges for the same conduct; and (3) the government's closing remarks about the seriousness of the case and the

"burden" of living in a drug-infested neighborhood deprived him of a fair trial. He also challenges his 360-month sentence on the theory that the district court misapplied the career offender sentencing guideline and imposed an unreasonable sentence. We reject these arguments and affirm Thomas's convictions and sentence.

## I. Background

Chicago police officers investigating open-air drug sales in a south-side neighborhood observed Terry Thomas directing street-level drug trafficking on four separate dates in 1999. On the morning of September 5, undercover officers watched from an abandoned building as Thomas and two others worked in concert to peddle drugs to passing motorists and pedestrians in the 800 block of West 50th Place. Thomas and one of his accomplices solicited potential business by shouting "rocks" (slang for crack cocaine) at passing cars. The third accomplice, a woman, stood a few doors down from Thomas ready to make the sales. Prior to directing a customer to the woman, Thomas ordered the second accomplice to search a nearby alley. After learning the alley was clear, Thomas relayed a signal to the woman, who then pulled what appeared to be drugs from her bra and made the sale. Minutes later, officers observed a similar sequence of events as a second customer approached the woman. Shortly thereafter, Thomas became suspicious that police were watching these transactions and ordered the second accomplice to check the building. The accomplice entered the building and was arrested by the officers positioned inside. The police also arrested Thomas.

Two days later Thomas was back on the street. On September 7 uniformed Chicago police officers patrolling

the same block of West 50th Place noticed several people forming a queue in an alley. The officers drove into the alley and overheard Thomas, whose back was to them, yelling "rocks" and "blows" (slang for heroin). As the people in the line scattered, Thomas turned, made eye contact with the officers and yelled, "four-seven," a street term meaning "police." The officers detained and searched Thomas but found no contraband.

About seven weeks later, on the morning of October 22, an undercover officer positioned in an abandoned building again observed Thomas shouting "rocks" and "blows" at passing cars in the same block of West 50th Place. One car stopped in front of Thomas, who after briefly talking with the driver, pointed to a woman standing on the sidewalk. The driver then got out of his car, approached the woman, and gave her some money. The woman responded by dropping what appeared to be a small bag of drugs in the driver's hands. The officer stuck his head out of the window to better observe the woman, but in doing so drew the attention of a young man on the sidewalk directly below him. The young man then crossed the street and talked to Thomas, and both men pointed up at the abandoned building. Thomas then jogged toward the woman conducting the drug sales, shouting something at her as he approached; she responded by running down a nearby gangway and out of sight. The officer radioed the woman's description and location to nearby officers, but they were unable to locate her.

Twelve days later, on the morning of November 3, undercover officers posing as construction workers positioned themselves in the back of a school bus parked close to West 50th Place. The officers watched and heard a man, later identified as Michael War and charged as

Thomas's coconspirator, making noises at people walking through the alley. War referred anybody who responded to his solicitation to a man seated on a nearby porch, later identified as Tyrone Thompson and also charged as a coconspirator. The officers watched Thompson make several drug sales, and then observed Thomas approach War and ask, "Are you out?" War in turn asked Thompson, "Are you out?" Thompson said he was, and Thomas told War, "Meet me by the yard." Thomas then resupplied War from a small bag he retrieved from a larger one stashed under a shrub. At this point the officers moved in and arrested War, Thompson, and Thomas, and recovered the bags. The smaller bag contained 2.9 grams of heroin; the larger one contained 11.2 grams of heroin and 15.1 grams of crack.

Based on the November 3 incident, Thomas was indicted on one count of possessing heroin and in excess of 5 grams of crack with intent to distribute. By way of superseding (and later amended) indictments, the government added a conspiracy count alleging that from August to November 1999, Thomas conspired with War, Thompson, and unnamed others to possess heroin and in excess of 5 grams of crack with intent to distribute. A jury convicted Thomas on both counts, and the district court sentenced him to 360 months' imprisonment.

## II.  Analysis

### A.  The Conspiracy Conviction

Thomas's primary argument is that the trial evidence was insufficient to prove the single drug conspiracy charged in the indictment. Thomas does not directly challenge the evidence against him stemming from the

four days of police surveillance at the West 50th Place drug market in 1999. He instead argues that because the evidence established that he worked with different accomplices and assumed somewhat different roles on each of those four dates, no rational juror could find from these four mini-conspiracies that he engaged in the single, overarching conspiracy charged in the indictment. The result, Thomas contends, was a fatal variance between pleading and proof.

When an indictment charges a lone conspiracy, proof of other conspiracies at trial is not problematic if the evidence also establishes the charged conspiracy. *See United States v. Messino*, 382 F.3d 704, 709-10 (7th Cir. 2004). The threshold question in fatal-variance analysis is whether sufficient evidence supported the charged conspiracy. *Id.* at 709. Put another way, Thomas must convince us that viewing the evidence in a light most favorable to the government, no rational juror could have found the single conspiracy alleged in the indictment. *Id.* This is a nearly insurmountable hurdle for most defendants, *United States v. Fassnacht*, 332 F.3d 440, 447 (7th Cir. 2003), and Thomas is no exception.

Thomas concedes that the evidence established he conspired with others to sell drugs on each of the four dates in 1999. Because all four incidents occurred within a two-month span on the same block of West 50th Place, a rational juror could easily conclude that the four episodes were part of a single, overarching conspiracy to carry on and protect an open-air drug market at this location on Chicago's south side during the late summer and fall of 1999. The incidents observed by the police were close in time and place and shared common characteristics (the verbal marketing of "rocks" and "blows," the

use of a lookout and a third person to conduct the hand-to-hand transactions). This evidence supports the inference of a common agreement "to further a single design or purpose," the defining characteristic of a conspiracy. *United States v. Bullis*, 77 F.3d 1553, 1560 (7th Cir. 1996). The singular purpose of the agreement was to transform this block of West 50th Place into what was essentially an open-air drug bazaar through which the dealers could market their wares to the public protected by scouts and lookouts who would alert them to any police presence. This was a cooperative venture characterized by shared interests. *See United States v. Shorter*, 54 F.3d 1248, 1254 (7th Cir. 1995) (overlapping interests imply a single conspiracy). As such, sufficient evidence supported the guilty verdict on the conspiracy count.

The West 50th drug market might more aptly be described as a collection of discrete conspiracies if the evidence demonstrated a hodgepodge of competing drug outfits trying to profit at the expense of the other or each having an objective independent from the others. *See United States v. Duff*, 76 F.3d 122, 126 (7th Cir. 1996); *Bullis*, 77 F.3d at 1560 ("[I]f there are distinct illegal ends and no overlapping interests between the alleged coconspirators, then there are separate conspiracies." (quotation omitted)). But Thomas's common presence on all four dates supports the inference that he was directing, at the street level, the four groups in question in pursuit of their shared, overlapping interests and a common goal. Thomas insists that his role as the common denominator was pure coincidence. Given the similarities between the four incidents, however, it is entirely implausible to suggest that the police just happened to stumble upon Thomas as he joined four new, discrete

conspiracies to sell drugs. *See Bullis* at 1561 ("[T]urnover in the members of a conspiracy does not transform a single conspiracy into multiple conspiracies so long as there is a continuation of the original conspiracy's purpose.").

In addition to being foreclosed by sufficient evidence of a single conspiracy, Thomas's fatal-variance claim (also stated as a constructive-amendment claim) is hamstrung by the fact that there was no variance between pleading and proof. The indictment alleged a conspiracy with War, Thompson, and unnamed others to distribute drugs between August and November 1999. The four incidents proved at trial fell within these parameters. *See Duff*, 76 F.3d at 126. The indictment therefore notified Thomas of all conduct to which criminal liability might attach. *See United States v. Payne*, 226 F.3d 792, 795 (7th Cir. 2000); *Duff*, 76 F.3d at 126. The evidence adduced at trial stayed within these confines and thus neither stood at variance with nor constructively amended the indictment.[1]

---

[1] Thomas also claims the district court constructively amended the count charging possession with intent to distribute (alleging he possessed heroin and in excess of 5 grams of crack "on or about November 3, 1999") by instructing the jury to find him guilty if he constructively possessed the drugs himself on November 3 (referring to the "resupplying" incident) *or* knowingly aided, counseled, or induced others' possession on any of the other four dates. The "on or about November 3" language put Thomas on notice that he could be liable for any possession on or about November 3, meaning "November 3" was not an element of the offense. *United States v. Folks*, 236 F.3d 384, 391 (7th Cir. 2001). Thus, the instructions did not impermissibly broaden the bases for conviction set forth in the indictment.

**B. Vindictive Prosecution**

Thomas contends the government abused the grand jury process while he was under state charges for the same conduct and added the conspiracy count for the sole purpose of admitting "other acts" evidence under Rule 404(b) of the *Federal Rules of Evidence*. Because he made this claim in a pretrial motion denied by the district court, we review the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Falcon*, 347 F.3d 1000, 1004 (7th Cir. 2003). Thomas was awaiting trial on state drug charges (later dismissed) when the government commenced its grand jury investigation. As such, Thomas claims federal prosecutors improperly used the grand jury to fish for evidence against an already indicted defendant. It is generally improper for prosecutors to continue to use the grand jury for the primary purpose of collecting evidence against a defendant on a charge for which a *federal* indictment has already been obtained. *United States v. Badger*, 983 F.2d 1443, 1459 (7th Cir. 1993). Under the doctrine of dual sovereignty, however, a federal grand jury is free to investigate a person who has been charged in state court if he is not yet under *federal* indictment for that conduct, *see United States v. Heideke*, 900 F.2d 1155, 1159 (7th Cir. 1990), which is precisely what happened in Thomas's case.

Thomas also claims the prosecution was vindictive because the government added the conspiracy count as a "backdoor" attempt to introduce evidence of Thomas's prior drug convictions (one in 1996, the other in 1998). Thomas's theory is flawed in two respects. First, the conspiracy count alleged a conspiracy in 1999 and therefore was not premised upon evidence of Thomas's activities in 1996 and 1998; Thomas has not independently

challenged the admissibility of the prior convictions. Second, there is nothing inherently vindictive about adding a charge by superseding indictment if the government has evidence the defendant committed the crime. *Bullis*, 77 F.3d at 1558-59. That the additional count makes it easier for the government to argue for the admission of "other acts" evidence does not make the prosecution of the additional count vindictive.

## C.  Improper Closing Remarks

Thomas also contends that two comments the prosecutor made to the jury during rebuttal closing argument deprived him of a fair trial.[2] The first referenced the "burden of living in a neighborhood that's infected with drugs." The second was the prosecutor's statement that Thomas "is here in federal court. He's facing federal charges. What he did was a federal offense. It's not a petty offense." Thomas's failure to object to the second comment means our review is for plain error only; Thomas must show that (1) improper remarks by the proscutor (2) deprived him of a fair trial (3) in a way that affected the outcome. *United States v. Sandoval-Gomez*, 295 F.3d 757, 762 (7th Cir. 2002). We need not discuss fairness or prejudice here because the remarks were not improper. Thomas's attorney had suggested in closing argument that the incidents underlying the alleged conspiracy involved mere "petty"

---

[2] Thomas also maintains he was deprived of a fair trial by surplusage in the indictment—specifically, certain sentencing allegations. The surplusage he complains about, however, was redacted from the indictment and never shown to the jury and thus had no impact on the trial.

state offenses; the government could properly remind the jury in rebuttal that federal drug and conspiracy charges are not petty. *See United States v. Torres*, 809 F.2d 429, 435-36 (7th Cir. 1987).

That Thomas preserved his objection to the prosecutor's "burden" comment is immaterial because it was not improper for the government to point out that living in a drug-infested community "burdens" the neighborhood. *United States v. Zanin*, 831 F.2d 740, 742-43 (7th Cir. 1987); *see Sandoval-Gomez*, 295 F.3d at 762. The "burden" reference was hardly an attempt to shift the burden of proof, as Thomas argues. Indeed, immediately following the comment the prosecutor reminded the jury that "we have the burden of proof." The court's burden-of-proof instruction, together with its cautionary instruction about the arguments of counsel, adequately protected against any possible misinterpretation of the prosecutor's reference to the "burden" that drug dealing places on neighborhoods.

### D.  Application of the Career Offender Guideline

Thomas concedes that his prior felony convictions made him eligible to be sentenced as a career offender under the sentencing guidelines. U.S.S.G. § 4B1.1 (2005). He instead argues that the district court misapplied the career offender guideline by failing to properly determine the statutory maximum punishment for his underlying conviction, a necessary step in computing the offense level under § 4B1.1(b). Even though the guidelines are advisory, the district court must accurately calculate and consult the defendant's guidelines range. *United States v. Booker*, 543 U.S. 220, 264 (2005); *United States v. Rodriguez-Alvarez*, 425 F.3d 1041, 1046 (7th Cir. 2005). We review

de novo the district court's interpretation of the guidelines. *United States v. Melendez*, 467 F.3d 606, 607 (7th Cir. 2006).

The career offender guideline pegs a defendant's offense level to the statutory maximum punishment for the underlying crime of conviction. U.S.S.G. § 4B1.1(b). Crimes punishable by life imprisonment receive an offense level of 37. This offense level when combined with a category VI criminal history (required here) yields an advisory sentencing range of 360 months to life. Crimes punishable by 25 years or more, however, receive an offense level of 34, yielding a range of 262 to 327 months. Because Thomas had a conviction for a prior drug felony, the applicable statutory maximum punishment for dealing 5 grams of crack cocaine is life imprisonment. 21 U.S.C. § 841(b)(1)(B)(iii); *see also United States v. Edwards*, 397 F.3d 570, 572 (7th Cir. 2005) (holding that "cocaine base" means "crack cocaine" for purposes of the enhanced penalties under § 841(b)). Had Thomas possessed the same quantity of noncrack cocaine, however, the statutory maximum would be 30 years. 21 U.S.C. § 841(b)(1)(C). In other words, a career offender convicted of dealing in excess of 5 grams of crack cocaine receives an advisory sentencing range of 360 months to life, whereas the same amount of noncrack cocaine would yield a range of 262 to 327 months.

Thomas insists that because the district court never expressly stated which statutory maximum (life or 30 years) applied to his offense, the court misapplied the career offender guideline. The main problem with Thomas's argument (aside from the fact that the court plainly referred to offense level 37 in calculating the career offender guideline) is that it assumes the district court had the responsibility at sentencing to decide

whether the substance in question was crack cocaine rather than noncrack cocaine. Because that determination increases the statutory maximum penalty from 30 years to life, the jury—not the court—must make it. *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *Horton v. United States*, 244 F.3d 546, 552 (7th Cir. 2001). The jury in Thomas's case did so. The special verdicts for both the possession and conspiracy counts specified that the substance in question was crack and its quantity exceeded 5 grams, and Thomas does not challenge these findings as a factual matter. Accordingly, the district court properly determined that Thomas's offense level was 37 under the career offender guideline.[3]

### E.  Reasonableness

Thomas also claims his sentence, which lies at the very bottom of his guidelines range, was unreasonable. On appeal, sentences within the advisory guidelines range are presumed reasonable, *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005), an appellate presumption that has been approved by the Supreme Court, *Rita v. United States*, 127 S. Ct. 2456 (2007). Thomas argues his sentence is unreasonable because the district court failed to adequately address his arguments for leniency and the sentencing factors in 18 U.S.C. § 3553(a). It is a boilerplate argument, unaccompanied by any discussion of

---

[3] Thomas also challenges the application of the leader/organizer enhancement, U.S.S.G. § 3B1.1. The application of this enhancement, however, did not ultimately affect the guidelines calculation; Thomas's advisory guidelines range was controlled by the career offender guideline.

particular mitigating factors the court supposedly over-looked or inadequately addressed.

Although in the district court Thomas made a passing reference to the harsh penalties for crack cocaine con-victions, he did not—and does not now—specifically advance an argument based on the 100:1 crack/powder cocaine disparity in guidelines sentencing. The Supreme Court recently held that this is an appropriate consider-ation for district courts exercising post-*Booker* sen-tencing discretion under § 3553(a), *see Kimbrough v. United States*, 128 S. Ct. 558 (2007), but because Thomas did not make the argument, we need not address it.

The lengthy sentencing transcript reveals that the district court listened to detailed sentencing arguments from counsel and took into account factors appropriate under § 3553(a), most significantly, Thomas's extensive crim-inal history and the fact that he appeared to be a full-time drug dealer. Thomas has not overcome the presumption of reasonableness.

AFFIRMED.