UNITED STATES of America,
Plaintiff–Appellee,

v.

Bernard WILSON, Luis Luna, and
Manuel Garcia, Defendants–
Appellants.

Nos. 96–1989, 96–1990 and 96–2024.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 8, 1997.

Decided Jan. 20, 1998.

David E. Bindi (argued), Barry Rand Elden, Chief of Appeals, Office of the United States Attorney, Criminal Division, Chicago, IL, for Plaintiff–Appellee.

William F. Trapp (argued), Brown, Hay & Stephens, Springfield, IL, for Defendant–Appellant Wilson.

Allan A. Ackerman (argued), Chicago, IL, for Defendant–Appellant Luna.

Robert A. Loeb (argued), Chicago, IL, for Defendant–Appellant Garcia.

Before FLAUM, DIANE P. WOOD, and EVANS, Circuit Judges.

FLAUM, Circuit Judge.

As the culmination of a months-long undercover operation, drug enforcement officials seized over 850 kilograms of cocaine in a series of busts during July and August of 1994. Along with eight co-defendants,[1] Appellants Bernard Wilson, Luis Luna, and Manuel Garcia were indicted for possession of cocaine with intent to distribute, as well as conspiracy to do the same, in violation of 21 U.S.C. §§ 841 and 846, respectively. Appellant Garcia pleaded guilty to the conspiracy charge shortly before trial. Appellants Wilson and Luna were tried before a jury, which found them guilty on both counts of the indictment. Judge Norgle sentenced Garcia and Luna to 262 months imprisonment each, and Wilson to 200 months imprisonment. Wilson now appeals both his conviction and his sentence, Luna challenges his conviction, and Garcia appeals his sentence. We affirm in all respects.

## I. BACKGROUND

Tony Varela is a paid DEA informant. Beginning in April 1994, Varela, posing as a representative of Canadian cocaine purchasers, insinuated himself into a Mexican group that distributed drugs in the United States. Varela began to negotiate with members of the group and, following a series of telephone calls with Defendant Gustavo Arroyo, they reached a tentative agreement to deliver 500 kilograms of cocaine to Chicago. At this point, in early July, law enforcement officers joined the undercover operation. Rafael Tovar, a Des Plaines police officer assigned to the Northeast Metropolitan Enforcement Group (NEMEG), took the role of the Canadian buyers' principal representative. DEA Special Agent Art Martinez assumed the role of Tovar's assistant.

---

**1.** Two of the eleven men who were indicted by the grand jury in this case have never been apprehended. Each of the remaining defendants was convicted of at least one count of the indictment. For the sake of clarity, we shall refer to the three individuals who presently appeal to this Court as "Appellants." The individuals who were convicted and are not before the Court on appeal will be referred to as "Defendants."

### A. The Undercover Operation and Initial Cocaine Seizure

Tovar contacted Arroyo and Appellant Manuel Garcia, who were staying at the time in a hotel in Juarez, Mexico, by telephone on July 7. A series of conversations ensued over the next three days in which Arroyo informed Tovar that the cocaine was already in Chicago, and arrangements were made for Arroyo and Garcia to fly to Chicago to oversee the transaction. Tovar wired funds to Arroyo and Garcia for their plane fare; they arrived in Chicago on July 11 and were greeted at the airport by Varela.

The agents housed Garcia and Arroyo in an apartment located in Justice, Illinois, that was outfitted with surveillance equipment and monitored by agents from a separate apartment nearby. On July 14, Tovar and Martinez, who had not yet met their "business partners," went to the apartment with Varela, who introduced the principals to each other. Appellant Garcia quickly got down to the details of the transaction. Garcia set the price at $20,000 per kilogram, which the agents agreed to, and discussed the amount of cocaine that he currently had available. Garcia told the agents that although 740 kilograms currently were stored nearby in Rockford, 300 kilograms were already promised to another buyer. Accordingly, this initial transaction would fall short of the 500 kilograms that had been discussed previously with Varela. Garcia reassured the agents that he would be receiving a new shipment in four days and that he could supply them with all the cocaine that they wanted. Garcia then paged "Vaquerito" (later identified as Defendant Horacio Caballero) and instructed him to call "the Engineer," [2] who was to call Garcia at the Justice apartment and tell Garcia how much of the Rockford supply could be sold to the agents. After making the call to Caballero, Garcia told the agents that he hoped that they would be doing business together on a regular basis and that he was expecting a new shipment of 500 kilograms to Chicago the following week.

The men also discussed delivery and payment logistics at the July 14th meeting.

Garcia proposed that he would drive a van that the agents had provided him to Rockford, where it would be loaded with the cocaine and delivered to Tovar and Martinez. At the same time, Varela would wait at the Justice apartment with an associate of Garcia's. When Tovar approved the cocaine, he would call Varela and authorize him to hand over the cash. The agents agreed to this arrangement which seemingly assured security on both sides. As Garcia put it, "the difficult one is the first one."

Before the meeting with the agents concluded, Garcia received a call from the Engineer. Garcia then told Tovar that he would go to Rockford personally and determine what he had available and that he would deliver everything he could as soon as possible. Garcia reiterated that he intended to provide the agents with more cocaine in the future and that things would run more smoothly when everyone trusted each other completely.

The deal was subsequently set for July 17, and Garcia promised to deliver 300 kilograms. However, the carefully orchestrated transaction began to unravel when Defendant Caballero, who was supposed to wait for the cash at the Justice apartment, had problems finding the apartment. Ultimately Garcia, along with Agents Tovar and Martinez, went to meet Caballero at a mall in Joliet to give him directions. When Caballero arrived, Garcia conferred with him and then told the agents that he had 300 kilograms ready to go. Garcia then drove the van that the agents had provided to Rockford with Tovar and Martinez following in another car. Both vehicles drove to a Denny's restaurant, where they waited for one of Garcia's co-conspirators to pick up the van and take it to be loaded. Defendant Angel Rojas arrived in a blue pickup truck accompanied by Appellant Luis Luna. Rojas talked to Garcia while Luna waited in the truck; Rojas then left the parking lot driving the van with Luna following him in the pickup. Rojas returned in the pickup less than an hour later with some bad news: After talking to Garcia briefly, the two men informed the agents that there was

---

**2.** The Engineer was identified subsequently as Jose Gonzales, one of the alleged kingpins of this operation. Although he was indicted in this case, Gonzales has never been apprehended.

some sort of parade passing by the building where the cocaine was stored and that police were therefore present. Accordingly, they could not load the drugs into the van. The deal was called off for the day and was rescheduled for the following morning.

Early on July 18, Agents Tovar and Martinez met Appellant Garcia at the same Denny's parking lot in Rockford. Garcia told Tovar that he now had 350 kilograms to deliver. Garcia then proceeded to make a number of telephone calls to set the deal in motion. He learned that Caballero was again not in place at the Justice apartment and that Rojas was not ready to deliver the cocaine until Caballero reached the apartment. While waiting for Rojas, Tovar had two telephone conversations with the Engineer. Tovar expressed his anger at the delays and threatened to pull out of the deal. The Engineer reassured Tovar that the deal would be completed soon and told him that he had an additional 500 kilos ready for delivery the following day.

Finally, Rojas arrived in the blue pickup at around 10:30 a.m. He spoke to Garcia briefly, and then the two conspirators informed Tovar and Martinez that Caballero was at the apartment and that they were ready to deliver the cocaine. Garcia then got in the pickup with Rojas and drove to Southgate Plaza, a nearby shopping mall, followed by Tovar and Martinez. The group proceeded to wait for the van in the mall parking lot. At 11:35 a.m. the van arrived, driven by Appellant Luna; he was accompanied by Defendant Guillermo Olivares, leading the van in a Geo Tracker, and Appellant Bernard Wilson, following Luna in a Cadillac. After checking the van's contents, Tovar and Martinez drove off in the van, with Garcia following them in Tovar's car. The agents then called their fellow officers and gave the signal to arrest all of the conspirators. Caballero and Arroyo were arrested at the Justice apartment, and Appellants Luna and Wilson, along with Olivares and Rojas, were arrested in Rockford. Still unknowingly following To-

var and Martinez towards Chicago, Garcia was arrested at a highway rest stop.

A subsequent inventory of the van's contents revealed 350 brick-shaped packages, 347 of which contained cocaine. The total amount of cocaine was 348.6 kilograms, with an average purity of 87%. The other three packages contained wood chips and plaster of paris.

### B. The Undercover Operation Continues

The July 18th arrests did not end Tovar and Martinez's investigation. Shortly after these arrests, while they were still driving back to the DEA's Chicago office, Tovar received a call from the Engineer, who identified himself as Jose Gonzalez and asked whether the transaction had gone well. Tovar told the Engineer that it had and ended the conversation. The Engineer called Tovar four more times within the next three hours, telling him that he could not locate any of his men and asking for Tovar's help. Later that afternoon, Tovar received a call from a new player, who identified himself as "Fernando" and stated that he was the Engineer's cousin.[3] Fernando asked Tovar whether he would be ready to purchase more cocaine soon, to which Tovar responded affirmatively. In addition, Fernando asked Tovar how he could reach Varela, since Varela was the buyer who gave Fernando's men the cash. Fernando wanted to know what had happened to his people and told Tovar that "I'm the boss of all those people who are there by you."

Because Fernando had never actually spoken to Varela before, Tovar gave Fernando the number of Special Agent Martinez, who would subsequently assume Varela's undercover identity. Fernando called Martinez, who told him that everything had gone according to plan. Almost immediately thereafter, Fernando called Tovar again, and told him that he knew that Appellant Luna had been arrested and that he believed the other men had been arrested as well. Undeterred by this turn of events, and eager to recoup his lost profits, Fernando told Tovar that he

---

3. Fernando was indicted in this case under the name Fernando Carrion. He too remains a fugi-

tive from the American justice system.

still planned to sell him 500 kilos within the next few days and that he could provide even more if Tovar was interested.

Over the next two days, Agent Martinez, still playing Varela's former role, maintained contact with Fernando and told him that he was looking into the arrests of Fernando's men. On July 20, Fernando called Tovar and told him that he had "tons" of cocaine available and that he would soon put Tovar in touch with some of his representatives in the Chicago area. After a series of telephone calls and discussions, it was decided that Varela, whom the agents had reinserted into the operation with a new identity, would meet with Fernando's associates on August 2. Varela talked briefly with two men, later identified as Defendants Estaban Gonzales and Arturo Rosales. Ensuing telephone conversations between Fernando and Tovar yielded an agreement to deliver 200 kilograms of cocaine the following day.

On the morning of August 3, Tovar and Martinez met Defendants Gonzales and Rosales and turned over to them the undercover van. The plan called for the defendants to take the van, load it with the 200 kilograms, and return it to the agents. Rosales told the agents that once he took the van he would call Fernando, and that Tovar would receive a call in about two hours to inform him where he could retrieve the cocaine-laden van. Tovar subsequently received the call and proceeded to the location with Martinez; they found the van parked on the street, with Gonzales and Rosales waiting down the street in another car. The agents drove off and passed Gonzales and Rosales on the way; Tovar told them that everything had gone well. A subsequent inventory of the van's contents revealed 201.2 kilos of 93%-pure cocaine.

The agents put an end to the operation on August 4, when the $4,000,000 for the delivery of the previous day was due. Gonzales and Rosales were arrested separately at different locations. Gonzales was arrested near a residential garage in south Chicago that he and Rosales had been using. He consented to a search of the garage, in which agents discovered a box containing over $200,000 in cash. Meanwhile, a team of agents followed

Rosales to another house on Chicago's South Side, where he was arrested. The agents executed a search warrant for the house and its garage and found a total of 263 kilos of 96%-pure cocaine.

### C. The Indictments and Sentencing

The appellants were indicted on two counts under the federal narcotics laws. Count One charged them with conspiracy to possess cocaine with intent to distribute in violation of 21 U.S.C. § 846. This conspiracy was alleged to include not only the July 18th Rockford delivery, but also the subsequent August 3rd delivery. Count Two charged them with possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841. This charge was based solely on the Rockford delivery of 350 kilograms.

Prior to trial, Appellant Garcia pleaded guilty to Count One and was sentenced to 262 months imprisonment. Appellants Wilson and Luna stood trial along with Defendants Caballero and Rosales and were convicted by a jury on both counts of the indictment. The court sentenced Wilson to 200 months imprisonment and sentenced Luna to 262 months imprisonment.

### II. DISCUSSION

The appellants raise a number of arguments on appeal. Wilson and Luna jointly bring two arguments concerning their trial. First, they assert that following their July 18th arrests, both of them confessed and accordingly withdrew from the conspiracy. They argue that the district court erred in admitting against them evidence of events that occurred after July 18. Second, they argue that the district court erred by refusing to charge the jury on a multiple conspiracy instruction that they had submitted to the court.

In addition, Appellant Wilson raises two separate claims pertaining to his trial and one claim pertaining to his sentence. First he argues that the district court erred by refusing to admit proffered testimony on surrebuttal. Second, he argues that, based on the Government's evidence regarding his culpable conduct within the conspiracy, the dis-

trict court erred by giving the jury a conscious avoidance, or "ostrich," instruction. Lastly, Wilson argues that the district court erred at sentencing by not considering whether to exercise its discretion and make a downward departure on his sentence under Note 14 to § 2D1.1 of the Sentencing Guidelines.

Appellant Garcia, who pleaded guilty, challenges two sentencing determinations made by the district court. He argues first that Judge Norgle erred by determining that he was a "manager or supervisor" of the conspiracy, mandating a three-level enhancement under the Sentencing Guidelines. Garcia's second argument is that the court erred in finding that he failed to plead guilty in a timely manner, which would have resulted in a one-level reduction of his sentence level. We shall address the appellants' contentions in turn.

### A. Wilson and Luna's Joint Contentions

#### 1. Conspiratorial Withdrawal

■ Following their arrests in Rockford on July 18, Appellants Wilson and Luna both demonstrated an initial willingness to cooperate with law enforcement officials. Wilson, who had driven the Cadillac in the conspirators' caravan to Southgate Plaza, admitted in a post-arrest statement that he had loaded the cocaine into the undercover van at the direction of Defendant Olivares, who owned a garage in Rockford and was Wilson's "legitimate" employer. Wilson took the agents to the warehouse in Rockford where the cocaine had been stored and showed them where 32 additional kilograms were hidden. Wilson also took the agents to a wooded area behind Olivares's garage and showed them where he had buried, allegedly at Olivares's direction, three additional packages of cocaine.[4]

Appellant Luna, who had driven the cocaine-filled van to Southgate Plaza, gave a statement to DEA Agent Mark Hannan following his arrest. He said that he had been hired for $5,000 in El Paso, Texas, by a man whom he refused to identify. His job includ-

ed renting cars and hotel rooms for his co-conspirators, most of whom did not speak English. In addition, Luna told Hannan that he had worked for the same organization in the past, that he had previously stored cocaine and marijuana for the organization at his home in El Paso, and that there currently was marijuana stored at the house. Luna consented to a search of his house; agents in El Paso seized 242 pounds of marijuana in the search.

Notwithstanding these rather damning confessions, both Wilson and Luna chose to stand trial along with Defendants Caballero and Rosales. At trial, the Government presented a substantial amount of evidence, as discussed above, regarding the ongoing nature of the conspiracy, Fernando and the Engineer's continuing efforts to sell more cocaine to Agents Tovar and Martinez after the July 18th arrests, the agents' interactions with Gonzales and Rosales, and the ensuing arrests and seizures of cocaine and cash on August 3 and 4. Wilson and Luna assert on appeal that their arrests, confessions, and assistance provided to the authorities constituted complete withdrawals from the conspiracy. *See United States v. Bullis,* 77 F.3d 1553 (7th Cir.1996); *United States v. Patel,* 879 F.2d 292, 294 (7th Cir.1989), *cert. denied,* 494 U.S. 1016, 110 S.Ct. 1318, 108 L.Ed.2d 494 (1990). Because they allegedly had withdrawn from the conspiracy, Wilson and Luna argue that the admission of evidence pertaining to the post-withdrawal activities of their codefendants unduly prejudiced them before the jury. Accordingly, they request a new trial in which evidence of the events occurring after July 18 would be inadmissible.

■ As an initial matter, Wilson and Luna concede that their trial attorneys did not raise this conspiratorial withdrawal argument in the district court. Because the appellants forfeited this argument by failing to raise it below, we can reverse the district court only if it was plain error for the court to have failed to conclude that Wilson and Luna withdrew from the conspiracy. *See* Fed.R.Crim.P. 52(b). Rule 52(b) affirmative-

---

4. Accordingly, it appears that Olivares was responsible for replacing three of the packages that were delivered to Agents Tovar and Martinez with the counterfeit packages that were filled with wood chips and plaster of paris.

ly limits our authority to reverse unless the defendant demonstrates that (1) error occurred, (2) the error was plain, and (3) the error affected the defendant's substantial rights. See *United States v. Olano,* 507 U.S. 725, 732–35, 113 S.Ct. 1770, 1776–78, 123 L.Ed.2d 508 (1993); *see also United States v. Ross,* 77 F.3d 1525, 1538 (7th Cir.1996). Even when the defendant can establish these three factors, we will not reverse the district court "unless, in our discretion, we find the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Ross,* 77 F.3d at 1538.

In this case, we need not decide whether to exercise our discretion since, at a minimum, the appellants cannot satisfy the second requisite factor of plain error review. With respect to this factor, we have clarified that "a 'plain' error is one that is clear and uncontroverted at the time of appeal." *See id.* at 1539. The argument that Wilson and Luna withdrew from the conspiracy is neither clear nor uncontroverted; accordingly, the district court's asserted failure to make a finding of withdrawal cannot be labeled plain error.

To withdraw from a conspiracy, a defendant must terminate completely his active involvement in the conspiracy, as well as take affirmative steps to defeat or disavow the conspiracy's purpose. *See, e.g., Bullis,* 77 F.3d at 1562; *Patel,* 879 F.2d at 294 ("[T]he law will not let you wash your hands of a dangerous scheme that you have set in motion and that can continue to operate and cause great harm without your continued participation. The courts hold that for withdrawal to limit a conspirator's liability ... mere cessation of activity is not enough.") (internal quotation omitted). The affirmative step required to constitute withdrawal must be either a full confession by the defendant to the authorities, or communication by the defendant of the fact of his withdrawal in a manner designed to reach his co-conspirators. *See, e.g., United States v. Sax,* 39 F.3d 1380, 1386 (7th Cir.1994). The withdrawal must be complete and in good faith. *See United States v. Andrus,* 775 F.2d 825, 850 (7th Cir.1985). In the instant case, Wilson and Luna argue that their post-arrest statements to the authorities constituted full con-

fessions in which they made clean breaks with their coconspirators. We do not agree with these assertions; more importantly for plain error review, we do not believe that such assertions are "clearly" true.

Appellant Wilson points to the facts that he confessed his complicity to authorities following his arrest, that he told them of Defendant Olivares's involvement in the conspiracy, and that he took them to two locations where Olivares had hidden additional amounts of cocaine. However, when Wilson stood trial on these charges, he denied in his cross-examination that he had confessed to the agents who arrested him. Furthermore, although Wilson led the agents to the three packages that he had buried behind Olivares's garage, at trial he denied that he knew, when he loaded the packages into the undercover van for the July 18th delivery, that the packages contained cocaine. Finally, Wilson never told the authorities that on six occasions in 1994 he had transferred money by wire to Mexico on Olivares's behalf. This reticence on Wilson's part indicates a desire to hide his role in the conspiracy, as well as to conceal the actions of his co-conspirators. Given these facts, we cannot say that it is uncontroverted that Wilson made, in good faith, the clean break that our precedent requires to establish conspiratorial withdrawal.

Luna similarly cannot demonstrate that he clearly withdrew from the conspiracy. As we have stated previously, Luna refused to identify the man in El Paso who had hired him for this job and paid him $5,000. This fact alone is sufficient to negate Luna's claim of conspiratorial withdrawal. *See, e.g., Sax,* 39 F.3d at 1386 (stating that withdrawal requires a *full* confession to the authorities). In addition, when Defendant Gonzales was arrested on August 4, he was found with a pager number for Luna. Yet Luna never identified Gonzales to the authorities in his post-arrest statements. Such reticence on Luna's part does not clearly indicate his alleged intention to thwart the goals of the conspiracy, an intent that is required for withdrawal to occur. *See Bullis,* 77 F.3d at 1562.

■ Moreover, even if we were entitled in this case to exercise our discretion under Rule 52(b), we do not believe that a miscarriage of justice would result if we refused to do so. *See Olano,* 507 U.S. at 736, 113 S.Ct. at 1778–79. Aside from the post-July 18th evidence, the Government presented a mountain of evidence regarding the appellants' guilt. Appellant Luna drove the van that contained 350 kilograms of cocaine to the delivery site on July 18, and he had been seen by Agents Tovar and Martinez accompanying Defendant Rojas during the aborted delivery the previous day. Wilson, meanwhile, drove a separate car during the July 18th caravan to the delivery site. In addition, he confessed that he had loaded the cocaine into the van and led agents to two additional stashes of cocaine. The substantial amount of evidence against these appellants convinces us that there is nothing to indicate that their convictions hinged upon the admission against them of post-July 18th evidence. Any asserted error that occurred in this context did not cast doubt upon the fairness or integrity of the appellants' convictions. *See Ross,* 77 F.3d at 1541. Accordingly, we reject Wilson and Luna's argument that the district court plainly erred by failing to find that they each withdrew from the conspiracy.

### 2. The Jury Instructions

Wilson and Luna argue that Judge Norgle should have permitted a jury instruction that would have enabled the jury to conclude that the prosecution had shown multiple conspiracies, as opposed to the single conspiracy charged in Count One of the indictment. They argue that the evidence was insufficient to establish the single conspiracy charged in the indictment and that the court also erred in rejecting their proffered multiple conspiracy instructions.

■ We first review the instructions proffered by the appellants and their co-defendants, all of which were rejected by the district court. These instructions asserted the defense theory of multiple conspiracies, as opposed to the single conspiracy charged in the indictment. A defendant is entitled to an instruction on his theory of defense only

if: (1) the proffered instruction is a correct statement of the law; (2) the defendant's theory is supported by the evidence; (3) the asserted defense theory is not already part of the charge; and (4) the failure to include the instruction on the defendant's theory would deny him a fair trial. *See, e.g., United States v. Katalinich,* 113 F.3d 1475, 1482 (7th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 260, 139 L.Ed.2d 187 (1997); *United States v. Douglas,* 818 F.2d 1317, 1320–21 (7th Cir.1987). We need not consider all four factors in this instance, since each one of the proposed instructions misstated the law.

All of the instructions proposed or adopted by the appellants commanded the jury to acquit if it found that the defendants were part of a conspiracy that involved only the first delivery on July 18 and found that the subsequent August deliveries constituted a separate conspiracy. Implicitly, the appellants argued that a finding of multiple conspiracies would constitute an impermissible variance between the single conspiracy charged in Count One of the indictment and the Government's proof at trial. *See, e.g., Bullis,* 77 F.3d at 1560. For example, an instruction proposed by Appellant Luna stated:

> If you find that a particular defendant is a member of another conspiracy, not the one charged in the indictment, *then you must acquit that defendant.* In other words to find a defendant guilty you must find beyond a reasonable doubt that he was a member of the conspiracy charged in the indictment and not some other, separate conspiracy.

(Emphasis added). In addition, Rosales proposed four different instructions that were also adopted by the appellants. Like Luna's proposed instruction, each one required the jury to acquit the defendants if it found that the conspiracy to which they were a party varied from the conspiracy charged in the indictment.

■■ We have addressed previously instructions requested by defendants charging that if the prosecutor does not prove exactly the conspiracy charged in the indictment, the jury should acquit. On numerous occasions, we have held without equivocation that "it is

an erroneous instruction that should not be given." *United States v. Duff,* 76 F.3d 122, 126 (7th Cir.), *cert. denied sub nom. Hill v. United States,* — U.S. —, 117 S.Ct. 148, 136 L.Ed.2d 94 (1996); *see also United States v. Townsend,* 924 F.2d 1385, 1410 (7th Cir.1991) (rejecting the propriety of an instruction substantively identical to those proposed by the appellants); *United States v. Wozniak* 781 F.2d 95, 96–97 (7th Cir.1985) ("The instruction [the defendant] wanted would have told the jury to acquit her if she did not join exactly the conspiracy charged. A jury should be told no such thing."). Once more, we stress that such a proposed instruction is always inappropriate as a matter of law. *See Townsend,* 924 F.2d at 1410. This is because "a prosecutor may elect to proceed on a subset of the allegations in the indictment, proving a conspiracy smaller than the one alleged," *Duff,* 76 F.3d at 126, so long as that subset is also illegal. If the conspiracy charged in the indictment includes the smaller conspiracy found by the jury, then the variance will not be fatal, since the indictment would have sufficiently notified the defendants of the Government's accusations. *See id.*; *see also Townsend,* 924 F.2d at 1410. The appellants' proposed instructions suggest that such a variance is always fatal; accordingly, the proposed instructions always will be incorrect.

■ The appellants' argument also fails to recognize that the district court provided the jury with a multiple conspiracy instruction that we approved as a correct statement of the law in *United States v. Nava–Salazar,* 30 F.3d 788, 795–96 (7th Cir.), *cert. denied sub nom. Casas v. United States,* 513 U.S. 1002, 115 S.Ct. 515, 130 L.Ed.2d 421 (1994). Furthermore, the instruction was appropriate given the facts of this case. Judge Norgle informed the jury that "[w]hether there was one conspiracy, two conspiracies, multiple conspiracies or no conspiracy at all is a fact for you to determine." The court then charged:

If you find ... that there was one overall conspiracy as alleged in Count One and that a particular defendant was a member of that conspiracy, you should find that defendant guilty of Count One.

If you find ... that there were two or more conspiracies and that a particular defendant was a member of one or more of these conspiracies, you may find that defendant guilty of Count One only if you further find ... that this proven conspiracy was included within the conspiracy alleged in Count One. If, on the other hand, the proven conspiracy is not included within the conspiracy alleged in Count One, you should find that defendant not guilty of Count One.

The charge thus informed the jury that, if it found that a defendant was a member of a conspiracy that constituted a sub-part of the conspiracy charged in the indictment, then it should find that defendant guilty. The jury's finding of guilt therefore concluded that the appellants were members of a conspiracy and that, at a minimum, this conspiracy was part of the single conspiracy alleged by the Government. *Cf. United States v. Butler,* 71 F.3d 243, 252 (7th Cir.1995) (recognizing that this Court presumes that the jury followed the district court's instructions).

■ "A defendant asserting a claim of variance will succeed in obtaining reversal of his conviction only if he establishes that (1) the evidence presented at trial was insufficient to support the jury's finding of a single conspiracy, and (2) he was prejudiced by the variance." *United States v. Curtis,* 37 F.3d 301, 305 (7th Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1110, 130 L.Ed.2d 1075 (1995). As we have stated previously, the jury gets the "first crack" at deciding whether there existed one conspiracy or many, and we "will uphold a jury's factual determination if, viewing the evidence in the light most favorable to the government, *any* rational juror could have found beyond a reasonable doubt that there was a single conspiracy." *Bullis,* 77 F.3d at 1560; *see also Curtis,* 37 F.3d at 301. In this case, a reasonable jury could infer a single conspiracy from the evidence that was presented at trial.

■ The Government presented substantial evidence at trial that the appellants worked for an organization that intended to import cocaine from Mexico to Chicago "by the tons." In his post-arrest statement to the authorities, Appellant Luna stated that

he had worked for the organization in the past and that he had previously stored cocaine at his home for the organization. Throughout the course of the undercover investigation in this case, the defendants made clear their desire and intent to establish an ongoing relationship. Appellant Garcia repeatedly told the agents of this desire and that they would trust each other more after the first transaction, since "the difficult one is the first one." Furthermore, the same two individuals—Fernando and the Engineer—orchestrated all of the transactions at the top level and indicated their desire to establish a continuing business relationship. Fernando claimed that he was "the boss of all those people who are there by you." This evidence was sufficient to enable the jury to infer the existence of a single agreement to sell the agents cocaine. The fact that the appellants were arrested prior to the second cocaine delivery does not make it any less likely that they were members of an illegal agreement to distribute cocaine that extended beyond July 18. Instead, "[a] reasonable jury could find that this evidence established a single conspiracy among the appellants that continued from the first contacts by DEA agents with the conspirators" until the second wave of arrests on August 4. *Nava–Salazar*, 30 F.3d at 796. Accordingly, we reject the appellants' jury instruction and variance claims.

### B. Wilson's Individual Claims

#### 1. The Rejected Surrebuttal Testimony

At trial, the Government presented evidence that placed Wilson in El Paso, Texas, on June 27 and 28, 1994. As the prosecution indicated in its closing argument to the jury, it was a "bad thing" for a defendant in the case to be tied to El Paso: "The Engineer was in El Paso, Garcia said, Luna was from El Paso. The conspirators talked about the cocaine coming from El Paso. El Paso is across the river from Juarez, where Arroyo and Garcia were." Wilson asserts that he could have presented surrebuttal evidence that would have mitigated the Government's evidence placing him in El Paso, and he argues that the district court's refusal to

allow the surrebuttal testimony denied him a fair trial.

The Government introduced in its case-in-chief a business record from the Traveler's Inn in El Paso. This record listed "Bernard Wilson" from Rockford, Illinois, as a guest at the hotel the night of June 27. The record did not include the license plate of Wilson's car or his driver's license number. When Wilson testified in his own defense, he claimed that he had never been to El Paso. In rebuttal the Government presented the testimony of an employee from the Traveler's Inn who identified a registration card indicating that "Bernard Wilson" stayed at the Inn on June 27. Unlike the business record introduced in the Government's case-in-chief, the registration card included Wilson's driver's license and license plate numbers. The employee testified that a desk clerk would not write down a driver's license number on a registration card or allow a guest to write it down himself without verifying it against an actual license.

Wilson wanted to introduce evidence on surrebuttal establishing that he did not possess a driver's license at the time in question. He argues that this evidence would have discredited the employee's testimony that Wilson's driver's license number could have been written on the registration card only if Wilson had presented the license to the desk clerk. Wilson believes that the fact that he did not possess a driver's license at the time he was alleged to have been in El Paso makes it more likely that the "Bernard Wilson" who stayed at the Traveler's Inn was an imposter.

We review a district court's decision to bar surrebuttal testimony for an abuse of discretion. *See United States v. Mitan,* 966 F.2d 1165, 1176 (7th Cir.1992), *cert. denied,* 506 U.S. 1059, 113 S.Ct. 994, 122 L.Ed.2d 145 (1993). Federal Rule of Evidence 611(a) confers authority upon district courts to exercise control over the mode and order of the presentation of evidence in the interests of ascertaining the truth and avoiding needless consumption of time. Given this authority, "great deference is accorded to the discretion and judgment of the trial court when granting and/or denying a party's mo-

tion for rebuttal or surrebuttal testimony." *United States v. Gaertner*, 705 F.2d 210, 217 (7th Cir.1983), *cert. denied*, 464 U.S. 1071, 104 S.Ct. 979, 79 L.Ed.2d 216 (1984).

■ The Government argues that the proffered surrebuttal testimony would have been irrelevant. We cannot agree with this point. In its case-in-chief the Government did not present any evidence regarding Wilson's driver's license. It was only in its rebuttal testimony that the Government raised the new issue of the license and allowed the jury to infer that the picture on the license would have been verified against the registrant. Accordingly, Wilson's surrebuttal testimony that he did not possess his license would have answered the Government's rebuttal evidence and would not have been cumulative. *See Gaertner*, 705 F.2d at 217. Under these circumstances, we believe that surrebuttal was appropriate and that the district court abused its discretion in this regard. *See United States v. Moody*, 903 F.2d 321, 331 (5th Cir.1990) (finding surrebuttal merited when the rebuttal testimony raised a new issue that broadened the scope of the Government's case, and the surrebuttal could have discredited the essence of the rebuttal testimony).

■ Nonetheless, this error was harmless beyond a reasonable doubt.[5] *See Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986); *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). As the Supreme Court asserted in *Van Arsdall*, "the Constitution entitles a criminal defendant to a fair trial, not a perfect one." 475 U.S. at 681, 106 S.Ct. at 1436. Accordingly, when reviewing errors implicating the Confrontation Clause, the harmless error doctrine "recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." *Id.* (citation omitted).

First, we note that Wilson's surrebuttal would not necessarily have established the proposition that he asserts, even if the jury believed that he did not have his driver's license on June 27. While the jury could have inferred that an imposter had a picture license in the name of "Bernard Wilson," a jury also could have inferred that—despite the hotel employee's testimony—someone, quite possibly Wilson, had been allowed to write a driver's license number on a registration card without presenting a driver's license for verification. It is equally likely, if not more so, that the jury would have drawn this second inference from the proffered testimony. Because the surrebuttal would not have resolved conclusively the question of whether Wilson was in El Paso, much less the question of his guilt, the testimony was not important in the context of the Government's entire case against Wilson. *See Ortega v. O'Leary*, 843 F.2d 258, 262 (7th Cir.) (recognizing that the importance of the testimony to the case is a factor to consider in harmless error analysis under *Chapman*), *cert. denied*, 488 U.S. 841, 109 S.Ct. 110, 102 L.Ed.2d 85(1988).

More significantly, the Government presented an overwhelming amount of evidence against Wilson at trial. *See Van Arsdall*, 475 U.S. at 684, 106 S.Ct. at 1438 (recognizing that, "of course," an important factor to consider is "the overall strength of the prosecution's case"). Wilson drove a car in the July 18th cocaine delivery to Southgate Plaza. After his arrest, Wilson confessed his complicity in the conspiracy. He told the agents that he had loaded the cocaine into the van, and he led the agents to two locations where he knew that more cocaine was hidden. Three agents testified at trial regarding Wilson's post-arrest statements. Thus, even if Wilson never had been to El Paso, an inference that the surrebuttal would not have established conclusively in any event, we believe beyond a reasonable doubt that the trial court's error was harmless.

---

5. The Government did not argue that the district court's decision to bar the surrebuttal testimony constituted harmless error. "[W]e have discretion to overlook a failure to argue harmlessness."

*United States v. Giovannetti*, 928 F.2d 225, 227 (7th Cir.1991). It is appropriate that we overlook such a failure in cases where the evidence against a defendant was overwhelming.

## 2. The "Ostrich Instruction"

When Wilson testified at trial, he stated that he was not aware that the bags in the van were filled with cocaine. He made this assertion in spite of the fact that he also testified that he had loaded the approximately 700 pounds of trash bags into the van and then, at Olivares's instruction, drove the van to a nearby street, parked it, left the keys inside, and watched someone drive it away. Wilson also testified that he was aware that Olivares had previously been convicted of distributing narcotics, and he stated that he was at Olivares's garage in November 1993 when federal agents executed a search warrant for the garage to look for cocaine. Given Wilson's asserted lack of knowledge that the bags in the van contained drugs, Judge Norgle determined that there were sufficient facts to support an inference that Wilson acted with deliberate ignorance. The court stated that "[a]mong other aspects of his testimony, Wilson testified that he did not know what was in certain bags and did not look into them or ask about them before locating them into a certain van." Accordingly, the district court chose to give the jury an instruction regarding conscious avoidance of knowledge, known colloquially as the "ostrich instruction." This instruction informed the jury that Wilson could not avoid the statutory element of acting "knowingly" by ignoring his suspicions and consciously avoiding the truth about the events that were transpiring.

We review the district court's decision to give the ostrich instruction for an abuse of discretion, considering the evidence in the light most favorable to the Government. *See, e.g., United States v. Walker*, 25 F.3d 540, 546 (7th Cir.), *cert. denied*, 513 U.S. 953, 115 S.Ct. 371, 130 L.Ed.2d 323 (1994). "The instruction should be given only when it addresses an issue reasonably raised by the evidence." *United States v. Stone*, 987 F.2d 469, 471 (7th Cir.1993). "Thus, we have held that the instruction is appropriately given when the defendant claims a lack of guilty knowledge and there is evidence that supports an inference of deliberate ignorance or wilful blindness." *United States v. Farouil*, 124 F.3d 838, 843 (7th Cir.1997). Wilson argues that the instruction was inappropriate in his case because all of the evidence against him—including driving a car in the July 18th cocaine delivery, acknowledging in his post-arrest statements that he knew the trash bags contained cocaine, and leading the agents to two locations where he knew additional bags of cocaine were hidden—pointed to his actual knowledge of the cocaine and his conscious participation in the conspiracy. He asserts that there was no evidence of his conscious avoidance of the truth; thus the evidence before the jury presented it with a binary choice—either Wilson actually knew of the conspiracy or he did not. If there was no evidence of his conscious avoidance of the truth, Wilson argues, the instruction was inappropriate because it allowed the jury to convict him for what he *should* have known and not for what he actually knew, thereby impermissibly introducing negligence principles into crimes that require proof of intentional action. *See United States v. Giovannetti*, 919 F.2d 1223, 1226–29 (7th Cir.1990).

We recognized recently that "[t]he government need not choose between presenting an actual knowledge case versus a conscious avoidance case to the jury. It may present both when the evidence so warrants." *Farouil*, 124 F.3d at 844. In this case, the evidence was sufficient to justify presenting both theories to the jury. Wilson's testimony that he was aware of Olivares's history of dealing in narcotics, combined with his actions on July 18–loading trash bags weighing approximately 700 pounds into a van, and then leaving the van parked on the street with the keys inside—is more than sufficient to support an inference of Wilson's conscious avoidance. On many previous occasions we have upheld the use of an ostrich instruction when a defendant transported under suspicious circumstances packages containing drugs and then claimed ignorance of the packages' contents. *See, e.g., id.; United States v. Vega*, 72 F.3d 507, 517 (7th Cir. 1995), *cert. denied sub nom. Early v. United States*, —— U.S. ——, 116 S.Ct. 2529, 135 L.Ed.2d 1053 (1996); United States v. Smith, 995 F.2d 662, 674 (7th Cir.1993), *cert. denied sub nom. Marren v. United States*, 510 U.S. 1056, 114 S.Ct. 718, 126 L.Ed.2d 683 (1994); *United States v. Rodriguez*, 929 F.2d 1224,

1227–28 (7th Cir.1991). Given Wilson's knowledge of Olivares's prior shady dealings and the suspicious nature of his July 18th activities, the jury reasonably could have concluded that, if Wilson did not actually know that the trash bags contained cocaine, he was consciously avoiding confirming the truth about the conspiracy in which he was involved. Thus, Judge Norgle's ostrich instruction to the jury was appropriate.

### 3. Wilson's Sentencing Argument [6]

■ Because the amount of cocaine relevant to Wilson's crimes exceeded 150 kilograms, his base offense level was set at 38 under the Sentencing Guidelines. *See* USSG § 2D1.1(c)(1). Judge Norgle increased Wilson's offense level by two levels for obstruction of justice under § 3C1.1, and applied a four-level reduction under § 3B1.2(a) due to Wilson's status as a minimal participant in the conspiracy. Accordingly, Wilson's final offense level was set by the court at 36 which, in light of Wilson's criminal history, yielded a sentencing range of 188 to 235 months imprisonment. Judge Norgle sentenced Wilson to a term of 200 months.

On appeal, Wilson now argues that the district court erred by not considering Application Note 14 to § 2D1.1 of the Guidelines. This Note provides that, in the absence of certain disqualifying factors, the court may consider a downward departure in a defendant's sentence only if it first finds the following: (a) the amount of controlled substance for which the defendant is accountable results in a base offense level greater than 36; (b) the offense level overrepresents the defendant's culpability; and (c) the defendant qualifies for a mitigating role adjustment under § 3B1.2.[7] Under these circumstances, the court can depart downward to a sentence from the guideline range that would have resulted if the defendant's base offense level had been 36 instead of 38. Had the court chosen to apply this Note to Wilson, ·for example, his final offense level would have been 34, with a sentence range of 151 to 188 months.

Wilson faces two insurmountable hurdles in making this argument. The first is that the district court chose to sentence Wilson to 200 months imprisonment, which the court found appropriately reflected the seriousness of Wilson's crime, when it could have sentenced him to 188 months. Therefore, we have no reason to believe that Judge Norgle thought that Wilson deserved a sentence of less than 188 months.

■ The second hurdle is that Wilson did ·not request that Judge Norgle consider Note 14 and exercise his discretion in this regard. We review waived sentencing arguments for plain error. *See, e.g., United States v. Monem,* 104 F.3d 905, 907 (7th Cir.1997). Nonetheless, Wilson contends that his failure to raise the argument in the district court cuts in his favor: He argues that since no mention of the Note was made in the district court, Judge Norgle was not aware of his authority under this provision to depart from the sentence mandated by the Guidelines, and that this asserted error therefore is reviewable on ·appeal. *See United States v. Poff,* 926 F.2d 588, 590–91 (7th Cir.) (en banc) (holding that a decision not to depart from the Guidelines is reviewable on appeal when it is the result of an erroneous legal conclusion about the court's authority to depart), *cert. denied,* 502 U.S. 827, 112 S.Ct. 96, 116 L.Ed.2d 67 (1991). Wilson's argument, however, rests on the faulty presumption that the district court is unaware of discretion-vesting provisions that are not raised. We presume that the opposite is true: "[A] claim that a seasoned judge ... didn't understand his discretion will rarely, if ever, be successful when built merely on inference. Article III judges are presumed to know the law...." *United States v. Kezerle,* 99 F.3d 867, 870 (7th Cir.1996). Because this Court is precluded by statute from reviewing discretionary refusals to downwardly depart, *see* 18 U.S.C. § 3742; *United States v. Shlater,* 85 F.3d 1251, 1257–58 (7th Cir.1996), and because Wilson has presented

---

**6.** Appellant Luna adopted Wilson's argument "to the extent it is applicable." Appellant Wilson's Br. at 21 n. 4. As we indicate *infra,* Wilson's argument is not applicable to Luna.

**7.** Judge Norgle explicitly found that Luna did not qualify for a mitigating role adjustment. He accordingly would not be eligible for a downward departure under Note 14.

no evidence to overcome our presumption that Judge Norgle exercised his discretion in this regard, we reject Wilson's argument concerning his sentence.

### C. Garcia's Sentencing Arguments

Manuel Garcia pleaded guilty to the conspiracy charge against him on September 26, 1995, one week before jury selection was scheduled to begin in the conspirators' joint trial. At sentencing, the court agreed with the Government that Garcia's base offense level of 38 should be enhanced three levels due to his role as a manager/supervisor in the conspiracy. *See* USSG § 3B1.1(b). Judge Norgle also decreased Garcia's sentencing level by two levels for "acceptance of responsibility" under § 3E1.1(a) as a result of his guilty plea, but he rejected Garcia's request to apply § 3E1.1(b)(2), which calls for an additional one-level decrease for a defendant whose timely plea enables the Government to avoid trial preparation and thereby efficiently allocate its resources. Garcia's final offense level for sentencing purposes therefore was 39, dictating a sentence range of 262 to 327 months imprisonment. Judge Norgle sentenced Garcia to the statutory minimum of 262 months imprisonment. Garcia now appeals the court's "manager/supervisor" and "timely plea" determinations.

#### 1. Garcia's Manager/Supervisor Status

We review the district court's factual determination that Garcia qualified for an "aggravating role" adjustment under § 3B1.1 for clear error. *See, e.g., United States v. Taylor,* 111 F.3d 56, 60 (7th Cir.), *cert. denied,* — U.S. —, 118 S.Ct. 242, — L.Ed.2d — (1997). Section 3B1.1(b) calls for a three-level enhancement when the criminal activity involves five or more participants and the defendant acted as a manager or supervisor with respect to any of the participants. *See* USSG § 3B1.1(b); *see also United States v. McGuire,* 957 F.2d 310, 315–17 (7th Cir.1992). At Garcia's sentencing hearing, Judge Norgle found the following:

> Garcia was involved with at least five participants, and that included Angel Rojas, Arroyo, Caballero, Gonzalez and Carrion.

The defendant oversaw the acquisition and the distribution of the cocaine from Mexico to Illinois and negotiated the price with the buyer. The defendant's direct contact with the leader and the co-defendant, Jose Gonzalez, and his claimed right to a huge profit of about $35,000 indicates he had a significant aggravating role as a manager in the transaction.... [T]he tapes indicate the managerial activity of Mr. Garcia and, clearly, he was a manager and supervisor of others.

Garcia argues first that Judge Norgle's findings were too general in nature to suffice to establish a managerial role. In any event, Garcia argues, any findings that the district court did make in this context were clearly erroneous, because he was actually nothing more than a middleman or a broker.

Garcia relies on our decision in *United States v. Thompson,* 944 F.2d 1331 (7th Cir. 1991), *cert. denied,* 502 U.S. 1097, 112 S.Ct. 1177, 117 L.Ed.2d 422 (1992), as support for his argument that the evidence relied on by the district court was too general to support its finding of an aggravating role. However, *Thompson* does not aid Garcia, because in that case we held only that the evidence regarding the defendant's role in setting the price that the conspiracy paid for cocaine, as well as his role in controlling deliveries of cash and cocaine, was insufficient to judge the scope of the defendant's conduct. *Id.* at 1349–50. We stated that "the government presented virtually no evidence that [Thompson] exercised any control or responsibility for the affairs of the conspiracy." *Id.* at 1350. Conversely, in the instant case Judge Norgle, after presiding over a jury trial of some of Garcia's co-conspirators, expressly found that Garcia exercised control over his co-conspirators, in part by making numerous telephone calls to Rockford and the apartment in Justice.

In addition, Judge Norgle adopted the presentence investigation report (PSR) prepared by the Government as an accurate reflection of the trial evidence in the case. In responding to the PSR Garcia did not object to the factual characterization of the offense; he only objected to the PSR's legal conclusion regarding his managerial status. Under

such circumstances we may affirm the district court's findings regarding a defendant's managerial role if they are adequately supported by the record, even if the district court fails to make explicit findings on the issue. *See United States v. Hall,* 109 F.3d 1227, 1234 (7th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 153, 139 L.Ed.2d 99 (1997). For these reasons, Garcia's argument that the district court's findings were too general in nature must fail.

 We also disagree with Garcia's contention that the district court's finding regarding his managerial status was clearly erroneous. Reviewing the evidence presented by the Government, it is apparent that Garcia was responsible for organizing and overseeing the July 18th delivery and that he had control over his co-conspirators, who were in the Chicago area to ensure that the transaction was successful. When meeting with the agents, Garcia negotiated the logistics of the delivery with Agent Tovar. Garcia told the agents that they would trust each other more in the future, since "the difficult one is the first one," and informed the agents of the conspiracy's intention to conduct business with them on an ongoing basis. In addition, Garcia directed Defendant Caballero to the Justice apartment to receive payment, and he was responsible for making sure that Rojas delivered the cocaine at the correct time. Garcia demonstrated significant authority over his coconspirators. *See United States v. Fones,* 51 F.3d 663 (7th Cir.1995).

Moreover, the evidence does not reflect Garcia's contention that he was merely a "steerer" or "middleman," for he was vested with authority over his co-conspirators in the Chicago area. *United States v. Sostre,* 967 F.2d 728 (1st Cir.1992), upon which Garcia relies heavily, is not factually similar to this case. As an initial matter, the amount of cocaine involved in Sostre was only one kilogram, 967 F.2d at 730, as opposed to the 350 kilograms which Judge Norgle determined to constitute Garcia's relevant amount for sen-

tencing purposes. This huge disparity alone is sufficient to distinguish Garcia's case from Sostre's. *See* USSG § 3B1.1, comment. (n. 4) (directing the district court to consider "the nature and scope of the illegal activity" in determining whether an aggravating role enhancement as an organizer or leader, as opposed to a manager or supervisor,[8] is merited). In addition, the First Circuit determined that "[t]here is nothing in the record to show that [Sostre] exerted control over any of the other codefendants" (save perhaps for one coconspirator acting as a lookout), *id.* at 733, a determination that is directly at odds with this case. Finally, *Sostre* itself indicated that if other factors had been present, such as a high degree of purity of the cocaine or representations by the defendant that he could deliver additional quantities, a finding of managerial authority could have been justified. *Id.* at 734. Both of these factors were present in Garcia's case. Accordingly, because neither precedent nor the evidence supports Garcia's argument that he acted merely as a middleman, and because sufficient evidence supports Judge Norgle's finding that Garcia acted in a managerial capacity, we reject Garcia's assertion that the district court erred in applying § 3B1.1(b).

### 2. Timeliness of Garcia's Guilty Plea

 The Sentencing Guidelines call for an additional one-level reduction for a defendant who accepts responsibility under § 3E1.1(a) and who "timely notif[ies] authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently." USSG § 3E1.1(b)(2). A defendant must prove by a preponderance of the evidence that he is entitled to the one-level reduction. *See, e.g., United States v. Wetwattana,* 94 F.3d 280, 285 (7th Cir.1996). We review the district court's factual findings regarding acceptance of responsibility for clear error. *See, e.g.,*

---

**8.** The Application Notes imply that the district court should consider the factors discussed in Note 4 only to determine whether a four-level enhancement as an organizer or leader, as opposed to a three-level enhancement as a manager

or supervisor, is appropriate. However, we have also relied on these factors to determine whether a defendant qualifies as a manager or supervisor in the first instance. *See, e.g., Fones,* 51 F.3d at 665.

*United States v. Covarrubias*, 65 F.3d 1362, 1367 (7th Cir.1995).

The facts regarding Garcia's plea negotiations are somewhat hazy, largely because the Government prosecutor with whom Garcia had been negotiating left the U.S. Attorney's office during the course of the negotiations. According to an affidavit filed by Garcia's attorney in the district court, plea negotiations had reached the penultimate stage when the Assistant U.S. Attorney conducting the negotiations, Frank Lipuma, informed Garcia's attorney that he was leaving the office. The new prosecutors assigned to the case indicated their intent to request a three-level enhancement due to Garcia's managerial status, an enhancement that Lipuma had apparently indicated he would not request. This change in the terms of the agreement derailed the negotiations and rendered Garcia's ultimate guilty plea untimely.

Garcia argues that a plea agreement was in place and that, but for the change in prosecutors, a timely plea would have been entered. At Garcia's sentencing hearing the Assistant U.S. Attorney addressed Garcia's contention by denying knowledge of any negotiations that preceded him: "I want to say right up front, I don't know what Mr. Lipuma may or may not have said in plea negotiations. He is not with the office." The Government also responded that it was preparing for trial against Garcia while the negotiations were proceeding.

We regard the Government's disavowal of any knowledge of the negotiations between Lipuma and Garcia with disfavor. Even when the Government changes its position in the course of plea negotiations, it retains an obligation to present fully the history of those negotiations to the district court. This obligation is particularly salient in the context of the district court's determination of acceptance of responsibility, since "[t]he timeliness of the defendant's acceptance of responsibility ... is context specific." USSG § 3E1.1, comment. (n. 6). In some circumstances, intentional prosecutorial footdragging that slows a timely plea may be a fact for the district court to consider under § 3E1.1(b)(2).

Nonetheless, we believe that the district court was correct in determining that Garcia was not entitled to the additional one-level reduction. He concedes that his negotiations with Assistant United States Attorney Lipuma were never finalized; even if those negotiations were complete, any agreement was still subject to the approval of Lipuma's supervisors. Accordingly, while Garcia's negotiations may have indicated an intent to enter a guilty plea, his expressed intent was insufficient in this case to save the Government from trial preparation. As Judge Norgle stated, Garcia could have pleaded guilty at a much earlier time had he so desired. *See Covarrubias*, 65 F.3d at 1367–68 (finding a one-level reduction under § 3E1.1(b)(2) unwarranted because the defendant failed to make a conditional offer to plead guilty); *United States v. Francis*, 39 F.3d 803, 808 (7th Cir.1994) ("Until the defendants actually pleaded guilty, they could still change their minds and the government still had to prepare for the contingency that the defendants might elect to go to trial."). Although § 3E1.1(b)(2) requires timely notification of an *intention* to plead guilty, and not a guilty plea itself, courts are still required to consider whether this expressed intent actually resulted in conserving Government and court resources. *See, e.g., Wetwattana*, 94 F.3d at 285–86; *Francis*, 39 F.3d at 808. Because a defendant is not bound by an expressed intention to plead guilty, it may indeed be a rare case in which intent, without more, actually will result in the conservation of resources.

In the instant case, Garcia failed to introduce any evidence that either his intention to plead guilty or his guilty plea allowed the Government to avoid preparation, or that court resources were conserved. In fact, the Government was required to prepare extensive transcripts of taped conversations regarding Garcia's participation in the conspiracy. Moreover, at such a late date the Government could not expediently eliminate all of the evidence that it had prepared against Garcia from its case against Garcia's co-defendants, thereby requiring the jury to hear evidence that the Government otherwise would not have presented. We conclude, therefore, that the district court did

not err in determining that Garcia was not entitled to a one-level reduction under § 3E1.1(b)(2).

## III. CONCLUSION

For the foregoing reasons, we affirm the appellants' convictions and sentences.